THE DICK C.

THE BROOKLYN.

THE NO. 12.

UNITED STATES LIGHTERAGE CORPORATION v. THE BROOKLYN et al.

No. A–16745.

District Court, E. D. New York.

Dec. 29, 1943.

Thomas A. McDonald, of New York City, for libelant.

Purdy & Lamb, of New York City (Edmund F. Lamb and Thomas J. Irving, both of New York City, of counsel), for claimant-respondent.

BYERS, District Judge.

In this cause recovery is sought by the bailee' in possession of the stick lighter Dick C, for damage said to have been sustained on December 3, 1942, when she was moored to pier 27, South Brooklyn, on the southerly side, being one of three similar vessels lined up on that side of the pier, of which the Dick C was the second.

The Lumberjack was the outboard vessel, lying some 25 feet or so inside the pier-end; an interval of 15 feet separated her from the Dick C, and that in turn was a like distance from the lighter Jane Anne—all in the control of the libelant in this proceeding.

The Dick C is about 90 feet long and 32 feet in beam; she was light, so that her freeboard fore and aft was about 8 feet, and perhaps 6 feet amidships, and she lay bow in, which means that her port side was alongside the pier.

The steamtug Brooklyn, having steel carfloat No. 12 alongside to port carrying six freight cars and a locomotive, entered the slip between piers 27 and 29 at a few minutes after 11 a. m. Wartime, having come from the Atlantic Basin; this means that she proceeded up the stream against an ebb tide and rounded to when off pier 29, and circled inshore so as to bring the float to the float-bridge at the shore end of the slip between these two piers.

The float was 287 feet long and 40 feet in beam, and as laden on this occasion had about 4 feet of freeboard. The tug Brooklyn is 91.7 feet long and 24.1 feet in beam. Thus the width of the tow was about 60 feet.

The wind was out of the west, blowing at from 38 to 40 miles an hour, which had been the condition for at least the 24 hours preceding the time in question, and the water was rough in the river and at the outer part of the slip.

The sole question for decision is of fact, namely, whether the carfloat No. 12 struck the Dick C while carrying out the maneuver which has been described.

For the lighter, two eye-witnesses of the contact testified, namely: Mr. Benjamin F. Chase, the treasurer of the libelant corporation, and Frank Anderson who testified that on the day in question he was employed by the libelant as a lighter captain, and was in charge of these three lighters while they were at this pier, but that he was not in libelant's employ at the time of trial of this cause. They were standing on the lighter Lumberjack at the bow, and said that the carfloat No. 12 rubbed along her side, and then was so maneuvered as to strike the Dick C amidships on her starboard side, within their direct vision.

Anderson testified that he had examined the Dick C below as part of his routine duties at about 7:30 on that morning, and that she had no water in her and was in all respects in good condition. Immediately following the striking, which he observed, he boarded the Dick C and found her taking water through open seams in her starboard side, and in a very few minutes it was of such a depth as to reach his knees. Pumps were at once rigged with the assistance of the witness Aronsen, and the lighter was kept afloat.

A survey was held on the following day, attended by representatives of the respondent, the claimant of the Brooklyn and the carfloat No. 12, and the following items of damage appear in the survey: Starboard side: Standing knees and anchor stocks broken; King posts pushed in; side planking broken; second wearing piece broken, etc. In other words, these items of damage were consistent with the collision testified to by the libelant's witnesses.

The respondent called Ilich, the captain of the tug Brooklyn, who was in charge of navigation; Rubinich, the mate of the tug, who was stationed on the bow of the carfloat as she approached the float-bridge; Faredich, the floatman, in the same position as the last witness; Simpkins, a deckhand on the tug, who was standing on her bow as entrance to the slip was made; and Casper, an engineer in the employ of the respondent, who was in the cab of the locomotive carried by the float on the center track and nearer the bow than were the freight cars which were equally distributed on the two side tracks toward the stern of the float.

All of these latter witnesses testified that there was no contact between the float and the lighter.

It does not seem to me that there is necessarily any false swearing, in spite of this conflict in testimony.

All of the witnesses called by the claimant-respondent were looking ahead toward the float-bridge, and the fact that they say that there was no such contact as the libelant's witnesses describe, may be explained by their preoccupation with their several tasks incident to making the lighter fast at the float-bridge, except as to Casper. His field of vision was limited.

The slip is about 300 feet wide and pier 27 is 686 feet long, and the float is about in the center, and there are two racks extending well beyond the float-bridge, and into the slip.

The northerly rack is about 150 feet long, and the southerly one is about 250 feet long; the object of the tug was to bring the carfloat into the space between them, and to the float-bridge, as will be understood by examining claimant's Exhibit A. In order to accomplish that, it was necessary for the tug, having circled around the entrance to the slip, to approach the float-bridge with pier 27 closer at hand than pier 29, since some maneuvering was obviously required.

It will also be observed that these piers extend in a northwesterly direction from the shore line—not westerly; this means that a wind out of the west would strike the float somewhat on her starboard side aft and incline her to swing toward pier 27 and a vessel lying there.

The witness Chase did not impress me as a person who would wilfully misstate the facts concerning which he professed to be an eye-witness, even though the interests of the corporation of which he is treasurer would be thereby benefited. In other

words, his narrative was convincing and, since his subsequent conduct was consistent with what he said he observed, his version of the circumstance is accepted. By this is meant, that he at once notified the first available representative of the respondent of the damage to the Dick C and the cause thereof; it appeared from the testimony that, as a result of these representations, the witnesses called by the respondent were at once examined and their statements taken.

Upon the conflicting testimony thus briefly described, the following are made:

### Findings of Fact.

1. Ownership, control and operation of the vessels involved in this case are found to be as alleged in the pleadings and stipulated by counsel.

2. On December 3, 1942, the stick lighter Dick C was lying on the southerly side of pier 27 in South Brooklyn, the second vessel inshore from the pier-end, and she was safely moored.

3. At between 11 and 11:15 a. m. Eastern Wartime on that day, the Dick C was struck by the carfloat No. 12 in tow of the tug Brooklyn on her starboard side amidships, and was damaged by that collision.

4. The Dick C was without fault.

### Conclusion of Law.

The libelant, United States Lighterage Corporation, as bailee in possession of the lighter Dick C, is entitled to the usual decree appointing a Commissioner to assess damages, with costs.

Settle decree.